**In re CREDITRUST CORPORATION, Debtor in Possession.**

No. 00–5–7812–JS.

United States Bankruptcy Court, D. Maryland.

June 17, 2002.

Michael W. Regnier, Toledo, OH, for Debtor.

Charles E. Bloom, Toledo, OH, for Tom D. Kelsey.

## MEMORANDUM OPINION SUSTAINING DEBTOR'S OBJECTION TO CLAIM OF TOM D. KELSEY

JAMES F. SCHNEIDER, Chief Judge.

The debtor in possession objected to the claim of Tom D. Kelsey ("Kelsey"). For the following reasons, the objection will be sustained and the claim will be disallowed.

### FINDINGS OF FACT

The claimant, Tom D. Kelsey sued Creditrust and Key Bank in Lucas County, Toledo, Ohio, (Case No. CI98–04497) for breach of contract, violation of the Fair Debt Collections Practices Act ("FDCPA") and defamation of credit. On each ground Kelsey sought $144,000 in compensatory damages. In addition, on the FDCPA claim he sought $100,000 in punitive damages and on the defamation claim he sought $250,000 in punitive damages. As to Key Bank he also sought $144,000 in compensatory damages, and $500,000 in punitive damages. In the instant bankruptcy case, Kelsey filed Claim No. 56 against the debtor in the total amount of $394,000, based upon the grounds set forth in the lawsuit.

It is the debtor's position that all of Kelsey's claims against Creditrust should be disallowed in their entirety. As to the breach of contract claim, it is uncontested that Creditrust had no contract with Kelsey that was ever breached. The grounds for the debtor's objection to the FDCPA claim were that (1) the FDCPA is only applicable to consumer debts, but Kelsey's debts were incurred in the course of his business; (2) the plaintiff could not demonstrate that he was harmed by reason of any false representations that were made; and (3) with respect to the defamation claim, there is no basis upon which to assess punitive damages because the plaintiff suffered no injury and because, in any event, the assessment of punitive damages is not permissible under FDCPA.

In the 1980s, Kelsey owned and operated a motor vehicle dealership. This business included used car sales, the sales of motorcycles, a towing agency and a credit insurance agency through which he sold disability, life, and health insurance for the vehicle purchases. In order to run that business Kelsey had a floor plan of $500,000 with Key Bank. He also had a demand note of $259,000. He owed approximately $750,000 to Key Bank. Finally, as part of his financing package, he had a comprehensive financial management credit line in the approximate amount of $25,000. In his application for that credit line to finance his business, he also applied for the MasterCard Gold card, which is at issue in this case.

In 1990, Key Bank obtained a judgment of $452,207.77 on Kelsey's floor plan and also sued Kelsey on the demand note for approximately $250,000. On December 19, 1991, Key Bank and Kelsey entered into a settlement agreement. Plaintiff's Exhibit 1. By that agreement, Kelsey paid

$150,000 to Key Bank, surrendered all of his commercial property and inventory, and in return, Key Bank released him from those obligations and related credit card obligations.

It is Kelsey's position, and one that Creditrust does not contest, that the settlement released Kelsey from the credit card obligations which were eventually sold to Creditrust.

In 1993, Key Bank sued Kelsey again on the comprehensive financial management account credit line for $25,000. The parties eventually resolved the matter for $5,000, pursuant to a settlement agreement executed in 1994. Kelsey Exhibit 2.

Kelsey claimed that the 1994 release also discharged him from any obligation on the credit card accounts that were sold to Creditrust. Creditrust does not dispute that contention.

On September 25, 1996, Creditrust purchased numerous accounts from Key Bank, among them three credit card accounts in Kelsey's name. Included in the purchase were hundreds of dead files in which no money was owed but which were inaccurately listed in the Key Bank system as being open accounts. Kelsey's debts were among the debts improperly included in the lot sold to Creditrust.

After the purchase, Creditrust made two inquiries on Kelsey's credit, the first on October 24, 1996, the second on November 25, 1996. Creditrust reported these three debts to the so-called "Big Three" credit bureaus. On November 28, 1996, Creditrust mailed three letters to Kelsey, one for each of Kelsey's accounts it purchased from Key Bank. Plaintiff's Exhibits 3, 4, and 5 to Kelsey's memorandum. On November 30, 1996, Creditrust sent another letter dealing with one of Kelsey's accounts, namely Key Bank USA Gold MasterCard. On several occasions in Novem-

ber, 1996, Creditrust employees spoke to Kelsey regarding these debts. On December 12, 1996, Kelsey informed Creditrust of the name and telephone number of his attorney, Charles Bloom. Creditrust employees contacted Mr. Bloom the same day and he indicated that he would send documentation to Creditrust proving that these debts were no longer outstanding.

The next day, December 13, 1996, Creditrust internally changed the status of Kelsey's account from "active" to "legal," according to Creditrust computer entries. The change in status, according to Creditrust's computerized system, was supposed to prevent further reporting to credit agencies of debts that were claimed to have been paid. Three days later, on December 16, Mr. Bloom sent a letter to Creditrust explaining why the three debts were no longer due and owing. Creditrust does not dispute that the letter was sent and received, although there is no record of the letter.

On January 7, 1997, the computer notes of both Key Bank and Creditrust indicate that representatives of the two entities spoke that morning and on that date the three Kelsey accounts were returned to Key Bank. At that time, the status of Kelsey's accounts at Creditrust was changed from "legal" to "returned," which was supposed to be further protection against misreporting the accounts to a credit bureau as unpaid. Claimant's Exhibit 10 is an Experian credit report showing that as of April 28, 1997, these obligations were no longer being reported on the Experian Credit Bureau report.

As of September 27, 1997, Trans Union, another credit reporting agency, was still reporting these debts on Kelsey's credit report. However, the reported debts had changed from "profit and loss write-offs" to "transferred to other lender," indicating that the accounts had been returned to

Key Bank, and were not active Creditrust accounts.

Kelsey contended that the appearance of Creditrust entries on his credit report from November, 1996, through September, 1997, interfered with his ability to obtain credit and thus prevented the expansion of his business.

Kelsey's first claim, Count 3 in the Ohio complaint, alleged breach of contract against Creditrust, specifically breach of the 1991 settlement agreement and the 1994 settlement agreement. Creditrust was not a party to either settlement agreement. The second claim of Kelsey is based upon the Fair Debt Collection Practices Act. Without citing a particular provision of the Act, Kelsey generally alleged that Creditrust made a false representation about the character and status of his accounts which caused him harm.

Creditrust argued that this claim should be disallowed because the FDCPA does not apply to these accounts. Under 15 U.S.C. § 1692a(5), to be subject to the FDCPA, a debt must be primarily for household purposes and be a consumer debt. Kelsey's application for his credit line account, by which he concurrently requested the MasterCard Gold account, indicated that the request was business-related. The settlement agreements with Key Bank that resulted in the 1991 and 1993 releases of these debts were all related to the Kelsey business.

## CONCLUSIONS OF LAW

■ This Court has subject matter jurisdiction over this dispute which is a core matter because it involves an objection to a claim, 28 U.S.C. § 157(b)(2)(B), albeit a claim based in part upon the FDCPA. *Cf. In re Goldstein*, 201 B.R. 1, 3–7(Bankr.D.Me.1996) (bankruptcy court lacks "related to" jurisdiction over a FDCPA proceeding), with *In re Belile*, 209 B.R. 658, 664 (Bankr.E.D.Pa.1997) (admission that non-core matter is a core matter amounts to consent to bankruptcy court jurisdiction); and *In re Littles*, 90 B.R. 669 (Bankr.E.D.Pa.1988)(debtor's adversary proceeding against creditor's attorney under the FDCPA was a non-core proceeding but the bankruptcy court nevertheless had "related-to" jurisdiction).

Creditrust received no consideration for either settlement agreement with Key Bank and therefore cannot be held liable for having violated agreements to which it was not a party. Accordingly, this portion of the claim must be dismissed.

■ The Fair Debt Collection Practices Act (FDCPA),[1] codified as 15 U.S.C. § 1692 *et seq.*, has no application to Kelsey's claim because the Court finds that the debts at issue were business debts, not consumer debts.[2] To establish a prima facie case in an action for violation of the Fair Debt Collection Practices Act, the plaintiff must prove that (1) the defendant was a debt collector, (2) the defendant's conduct in attempting to collect a debt was prohibited by the Act and (3) the debt was a consumer debt. *See* Robin Cheryl Miller, CAUSE OF ACTION FOR VIOLATION OF FAIR DEBT COLLECTION PRACTICES ACT [15 U.S.C. §§ 1692–1692*o*], 14 *Causes of Action* 315

---

1. (Pub.L. 90–321, May 29, 1968, Title VIII as added Pub.L. 95–109, Sept. 20, 1977, 91 Stat. 874).

2. See 15 U.S.C. § 1692a(5) which states:
    As used in this subchapter—
      (5) The term "debt" means any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment. *Id.*

(1987), First Series (October 2001 Cum. Supp.).

■ Even were this a consumer debt, Kelsey has no claim under the FDCPA because the false representation he claimed Creditrust made was made to him in the letters Creditrust sent to him. The FDCPA specifically permits the kind of communication that Creditrust conducted with Kelsey.[3] Because these letters were sent only to Kelsey, he can show no misrepresentation made to credit bureaus that caused injury to his credit, as required by the FDCPA. Because the claimed injury was to his business, there is no relief afforded to him by the FDCPA.

■ Kelsey also cited 15 U.S.C. § 1692e(8)[4] for the proposition that one is

3. § 1692c. Communication in connection with debt collection
   (a) Communication with the consumer generally
   Without the prior consent of the consumer given directly to the debt collector or the express permission of a court of competent jurisdiction, a debt collector may not communicate with a consumer in connection with the collection of any debt—
   (1) at any unusual time or place or a time or place known or which should be known to be inconvenient to the consumer. In the absence of knowledge of circumstances to the contrary, a debt collector shall assume that the convenient time for communicating with a consumer is after 8 o'clock antemeridian and before 9 o'clock postmeridian, local time at the consumer's location;
   (2) if the debt collector knows the consumer is represented by an attorney with respect to such debt and has knowledge of, or can readily ascertain, such attorney's name and address, unless the attorney fails to respond within a reasonable period of time to a communication from the debt collector or unless the attorney consents to direct communication with the consumer; or
   (3) at the consumer's place of employment if the debt collector knows or has reason to know that the consumer's employer prohibits the consumer from receiving such communication.
   (b) Communication with third parties
   Except as provided in section 1692b of this title, without the prior consent of the consumer given directly to the debt collector, or the express permission of a court of competent jurisdiction, or as reasonably necessary to effectuate a postjudgment judicial remedy, a debt collector may not communicate, in connection with the collection of any debt, with any person other than the consumer, his attorney, a consumer report-

ing agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector.
   (c) Ceasing communication
   If a consumer notifies a debt collector in writing that the consumer refuses to pay a debt or that the consumer wishes the debt collector to cease further communication with the consumer, the debt collector shall not communicate further with the consumer with respect to such debt, except—
   (1) to advise the consumer that the debt collector's further efforts are being terminated;
   (2) to notify the consumer that the debt collector or creditor may invoke specified remedies which are ordinarily invoked by such debt collector or creditor; or
   (3) where applicable, to notify the consumer that the debt collector or creditor intends to invoke a specified remedy.
   If such notice from the consumer is made by mail, notification shall be complete upon receipt.
   (d) "Consumer" defined
   For the purpose of this section, the term "consumer" includes the consumer's spouse, parent (if the consumer is a minor), guardian, executor, or administrator.
   *Id.*

4. Section 1692e(2)(8) provides:
   1692e. False or misleading representations
   A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

   *   *   *   *   *   *

   (8) Communicating or threatening to communicate to any person credit information which is known or which should be

not allowed to communicate or threaten to communicate to third parties information which is known or should be known to be false. The Court finds that Creditrust had no knowledge of the falsity of the information when it reported it to the credit agencies because it had no knowledge that Key Bank had settled the accounts. Any communication made by Creditrust to the credit bureaus was made in good faith. Creditrust had no reason to know that any accounts that it purchased from Key Bank were invalid. When Creditrust learned that the debts in question had been settled, it took immediate action to change the status of the accounts. Additionally, the FDCPA does not prohibit a debt collector from communicating to agencies, and a communication, in and of itself, to a consumer reporting agency, does not support a cause of action under the FDCPA. 15 U.S.C. § 1692(c)(b) (". . . a debt collector may not communicate, in connection with the collection of any debt, with any person *other than the consumer, his attorney, a consumer reporting agency if otherwise permitted by law*, the creditor, the attorney of the creditor, or the attorney of the debt collector.") (Emphasis supplied.)

Creditrust is entitled to claim a defense to liability under the statute provided by the FDCPA itself in Section 1692k(c).[5] The defense requires that any improper disclosure be unintentional and result from a bona fide error, despite procedures undertaken by the debt collector that were "reasonably adapted to avoid any such error." This the debtor has proven by a preponderance as required by the statute.

Accordingly, this Court finds no liability of the debtor to Kelsey pursuant to the FDCPA and will dismiss the claim as it relied on the statute.

Count 2 of the Kelsey's complaint was for defamation, based upon the publication of false statements to credit bureaus. The plaintiff must prove harm or actual injury that occurred because of the false statement, such as a loss of credit or the denial of employment. Ohio law requires that the claimant prove negligence on the part of Creditrust in publishing false information and that the publication produced actual damages.

However, the Court finds no evidence tending to show that Creditrust was negligent or that it violated any reasonable commercial practices or standards when it purchased the Key Bank accounts then communicated the false information contained in the accounts to credit bureaus. Publication to Kelsey of the letters Creditrust sent him, as opposed to publication to a third party, is not sufficient to prove defamation of credit under Ohio law.

In Ohio, it has been held that "[a] cause of action for defamation consists of five elements: (1) a false and defamatory statement, (2) about plaintiff, (3) published without privilege to a third party, (4) with fault of at least negligence on the part of the defendant, and (5) that was either defamatory *per se* or caused special harm to the plaintiff." *Gosden v. Louis*, 116 Ohio App.3d 195, 206, 687 N.E.2d 481,

---

known to be false, including the failure to communicate that a disputed debt is disputed.

15 U.S.C. § 1692e(8).

**5.** 15 U.S.C. § 1692k. Civil liability
  (c) Intent
    A debt collector may not be held liable in any action brought under this subchapter if

the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.
*Id.*

488 (1996). The plaintiff in a defamation suit must prove the fourth element, that of fault, by clear and convincing evidence. *Lansdowne v. Beacon Journal Pub. Co.,* 32 Ohio St.3d at 180–181, 512 N.E.2d at 983–985. "For all *prima facie* elements [of defamation], excluding the element of fault, the proper burden of proof is the preponderance standard." *Davis v. Jacobs,* 126 Ohio App.3d 580, 710 N.E.2d 1185, 1186 (3 Dist.1998)(*citing Embers Supper Club, Inc. v. Scripps–Howard Broadcasting Co.,* 9 Ohio St.3d at 24–25, 457 N.E.2d at 1166–1167). "Fault is established by determining whether 'the defendant acted reasonably in attempting to discover the truth or falsity or defamatory character of the publication.'" *Franks v. The Lima News,* 109 Ohio App.3d 408, 412, 672 N.E.2d 245, 248 (1996), *quoting Embers,* 9 Ohio St.3d at 25, 457 N.E.2d at 1167. This Court has already absolved Creditrust of fault in connection with the plaintiff's claim under the FDCPA. It is equally true that Kelsey has failed to prove fault according to the Ohio standard of clear and convincing evidence.

▇ Likewise, Kelsey has produced insufficient evidence to prove actual injury caused by Creditrust. Therefore, even were this Court to assume that Kelsey could prove that Creditrust defamed him, he can demonstrate no damages. *See Ohio Pattern Jury Instructions* on defamation, 264.04–2. In order to prove actual injury, Kelsey must show that Creditrust's notations on his credit reports actually caused him to be denied credit and that the credit so denied would have given him the wherewithal to realize at least $144,000 in profit from his used car dealership which he claimed the denial of credit prevented him from expanding. This he cannot do. There is no evidence that any action by Creditrust caused Kelsey to be denied credit in the eight rejection letters he attached to his memorandum as Exhibits 12–18. He testified at deposition that these were the only denials of credit of which he was aware. None mentioned Creditrust and Kelsey testified at his deposition that none of those agencies he contacted ever blamed Creditrust for their denial of credit to him.

The reasons for denial of credit set forth in the letters included repossession, foreclosure, judgment liens and insufficiency of cash flow. One letter indicated that it did not rely on credit reports, but rather reliance upon information from another undisclosed source.

The Experian credit report, Kelsey Exhibit 10, disclosed a plethora of adverse actions against Kelsey, including judgments, a state tax lien, past-due credit card accounts, a collection case from an animal hospital and a past-due debt held by a collection bureau. For this reason, the plaintiff cannot prove that his inability to obtain credit was the prospective lenders' reliance upon a false credit report. Wile it is true that Kelsey was initially rejected by National City Bank for a loan because of the Creditrust notation on is credit report, Kelsey admitted that he received the loan one week after he presented the Key Bank settlement agreement. The only delay he can suffered was the one week it cost him in obtaining the loan.

For these reasons, the debtor's objection to the claim of Tom D. Kelsey will be SUSTAINED and the claim will be DISALLOWED.

ORDER ACCORDINGLY.